IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHARLES L. SANDERS,

          Petitioner,                No. CIV S-05-2250 FCD DAD P

    vs.

DIRECTOR OF CDC, et al.,

          Respondents.         <u>FINDINGS & RECOMMENDATIONS</u>

_____/

       Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction entered against him on January 22, 2003, in the Solano County Superior Court for selling cocaine base. He seeks relief on the grounds that: (1) he received ineffective assistance of trial and appellate counsel; (2) his "right to discovery" was violated; (3) he was misidentified through the use of a suggestive identification procedure; (4) the prosecutor committed misconduct; (5) his right to confront the witnesses against him was violated; and (6) he is entitled to a new trial on the basis that newly discovered evidence could exonerate him.  Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

/////

1

PROCEDURAL AND FACTUAL BACKGROUND[1]

On March 28, 2002, at approximately 4:00 p.m., officers from the Department of Alcohol Beverage Control (ABC) and the Fairfield Police Department were conducting a joint undercover operation targeting the sale of street narcotics in areas known for such activity.  Officer Espinoza from ABC drove her unmarked vehicle into the parking lot of a 7-Eleven store on Tabor Avenue in Fairfield and called a man, later identified as Lavelle Nichols, over to her car.  Espinoza asked Nichols if he could "hook [her] up" with $20 worth of cocaine.  Nichols instructed her to wait there, walked to the rear of a nearby motel, and returned with another man, later identified as defendant.  After a brief discussion, defendant produced a clear plastic baggie containing cocaine. Espinoza asked defendant if he wanted $20 for the baggie, to which he replied, "yes."  After the exchange, defendant walked away and Espinoza drove off, advising Fairfield Police Detective Nipper via radio wire-transmission of the completed transaction and a description of the two men.  Specifically, Espinoza identified defendant's race, height, weight, and indicated he was wearing a red 49'ers jersey with the number "8."  Within several minutes, Fairfield Police Officer Gagliardo entered the 7-Eleven parking lot in an attempt to locate the subjects fitting the descriptions provided by Espinoza.  Gagliardo contacted Nichols and observed defendant, whom he also recognized from prior contacts.[2]

Thirty minutes later, after returning to the police department and getting the subjects' names from Officer Gagliardo, Detective Nipper pulled up a "[m]ug shot[ ]" of each from the police department database and showed them to Officer Espinoza.  She identified defendant as the man from whom she purchased the cocaine.  An arrest warrant for defendant was issued; and on April 12, 2002, a felony complaint was filed and defendant was taken into custody.  Defendant was formally arraigned on May 24, 2002.

---

[1]  The following summary is drawn from the June 16, 2004 opinion by the California Court of Appeal for the First Appellate District (hereinafter Opinion), filed as Respondent's Exhibit 5, at pgs 1-3.  This court presumes that the state court's findings of fact are correct unless petitioner rebuts that presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(1); Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004).  "Clear and convincing evidence " within the meaning of § 2254(e) "requires greater proof than preponderance of the evidence" and must produce "an abiding conviction" that the factual contentions being advanced are "highly probable."  Cooper v. Brown, 510 F.3d 870, 919 (9th Cir. 2007) (quoting Sophanthavong v. Palmateer, 378 F.3d 859, 866 (9th Cir. 2004)).  Petitioner has not overcome the presumption with respect to the underlying events.  The court will therefore rely on the state court's recitation of the facts.

[2]  The field identification card filled out by Officer Gagliardo incorrectly reported defendant's race as Black.  The rest of the ID card, however, correctly identified defendant's name, age, height, weight, hair and eye color, and clothing.

He refused to waive time, and a readiness conference was set for July 11, 2002.

When defense counsel appeared on July 11, he informed the trial court he had "a concern, a question as to Mr. Sanders' competency . . . ." The court suspended criminal proceedings and ordered examinations by Herb McGrew, M.D., and Carlton Purviance, Ph.D. The reports of both doctors were presented to the court and counsel. Dr. McGrew, a psychiatrist, found defendant "harbors more psychopathology than meets the eye . . . and that he is, despite his eagerness to proceed, less competent to do so than he appears." Dr. Purviance, a psychologist, found a "distinct element of grandiosity, overestimation of self-importance, and markedly impaired judgement [ sic ] . . . ." He further indicated defendant likely suffered from a "significant psychiatric disturbance (probably Schizoaffective Disorder) [that] is compromising the Defendant's ability to realistically appraise his case . . . ." Each indicated that defendant was unable to reasonably assist his attorney in his defense and a finding of incompetence was warranted.

On August 2, 2002, defendant's attorney submitted the matter on the record, both counsel waived the right to a trial on the issue of competence, and the court found defendant incompetent to proceed under Penal Code section 1368. During that appearance, the court noted defendant had attempted to file several "motions," one to set aside the information and one indicating his dissatisfaction with his attorney. At that time, defendant objected to the delay in the proceedings and told the court that he had filed his own papers and that his "demand for a speedy trial ha[d] been . . . denied . . . ." While allowing defendant to state his complaints on the record, the court explained the motions "can't be heard at this time" as the criminal proceedings had been suspended. On August 16, 2002, the court committed defendant to Atascadero State Hospital, and he was admitted on October 2, 2002.

While at Atascadero, defendant participated in a trial competency treatment course, but the record does not indicate he received any psychiatric treatment or medication there. Atascadero reported in early November 2002 that defendant was competent to stand trial, and the court reinstated criminal proceedings on November 22, 2002.

Jury trial commenced on January 21, 2003; and after the prosecutor dismissed count II, the jury found defendant guilty of selling a controlled substance in violation of Health and Safety Code section 11352, subdivision (a). On January 22, 2003, the court found one enhancement under Health and Safety Code section 11370.2, subdivision (a), and three enhancements under Penal Code section 667 .5, subdivision (b) to be true. Defendant was sentenced to 10 years in state prison. This timely appeal followed.

3

1    After petitioner's judgment of conviction was affirmed on appeal, he filed a

2  timely petition for review in the California Supreme Court, which summarily denied review by

3  order dated August 25, 2004.  (Answer, Exs. 6, 7.)  Petitioner subsequently filed a petition for a

4  writ of habeas corpus in the Solano County Superior Court, which was denied by written

5  decision dated December 2, 2004.  (Pet. at 4(c) - 4(f).)  Thereafter, petitioner filed petitions for a

6  writ of habeas corpus in the California Court of Appeal and California Supreme Court, both of

7  which were summarily denied by orders dated October 27, 2005, and September 20, 2006,

8  respectively.  (Id. at 4(g), 4(i).)

9                                          ANALYSIS

10  I.  Standards of Review Applicable to Habeas Corpus Claims

11    A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of

12  some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860,

13  861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v.

14  Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the

15  interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

16  Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.  Habeas

17  corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377

18  (1972).

19    This action is governed by the Antiterrorism and Effective Death Penalty Act of

20  1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d

21  1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting

22  habeas corpus relief:

23                An application for a writ of habeas corpus on behalf of a
              person in custody pursuant to the judgment of a State court shall
24            not be granted with respect to any claim that was adjudicated on
              the merits in State court proceedings unless the adjudication of the
25            claim -

26  /////

                                            4

1

        (1) resulted in a decision that was contrary to, or involved
an unreasonable application of, clearly established Federal law, as

2

determined by the Supreme Court of the United States; or

3

        (2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the

4

State court proceeding.

5 See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362

6 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).  If the state court's decision

7 does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review

8 of a habeas petitioner's claims.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008).  See

9 also Frantz v. Hazey, 513 F.3d 1002, 1013 (9th Cir. 2008) (en banc) ("[I]t is now clear both that

10 we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such

11 error, we must decide the habeas petition by considering de novo the constitutional issues

12 raised.").

13         The court looks to the last reasoned state court decision as the basis for the state

14 court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  If the last reasoned

15 state court decision adopts or substantially incorporates the reasoning from a previous state court

16 decision, this court may consider both decisions to ascertain the reasoning of the last decision.

17 Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  Where the state court

18 reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

19 habeas court independently reviews the record to determine whether habeas corpus relief is

20 available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Pirtle

21 v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  When it is clear that a state court has not

22 reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the

23 AEDPA's deferential standard does not apply and a federal habeas court must review the claim

24 de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

25 /////

26 /////

1  II.  Petitioner's Claims

2        A.  Violation of Petitioner's Right to Discovery

3              Petitioner claims that his Fifth Amendment "right to discovery" was violated

4  when the trial court failed to order the prosecutor to turn over petitioner's "booking photo" to the

5  defense prior to trial.  (Pet. at 52-54.)  Petitioner explains that he filed a discovery motion but

6  that the trial court "never acted on the motion."  (Id. at 54.)  Petitioner has filed a copy of a

7  discovery motion signed and apparently drafted by him without the involvement of his trial

8  counsel.  (Court Doc. 17, entitled "Exhibits in Support of Petition Lodged" (hereinafter Pet'r's

9  Exs.) at 92-99.)  The motion does not contain any indication that it was filed in the trial court.

10 (Id.)  In that motion, petitioner requests discovery of, among other things, "all relevant real

11 evidence seized or obtained as a part of the investigation of the offenses charged" and "any

12 exculpatory evidence."  (Id. at 98.)  The motion does not specifically mention a "booking photo."

13 (Id.)  The state court record reflects that no discovery motion was filed with the court in

14 petitioner's case.  (Answer, Ex. 1.)

15             The state court record also reflects that a "booking photo" taken of petitioner at

16 the time he was arrested was admitted into evidence at trial during the prosecutor's cross-

17 examination of Laura Queza, petitioner's alibi witness.  (Answer, Ex. 15 at 88-91.)  Petitioner's

18 trial counsel initially voiced an objection to the admission into evidence of the booking photo,

19 but withdrew his objection after viewing the photo and participating in a sidebar conference.  (Id.

20 at 90-91.)  At trial, Ms. Queza testified that "most likely" she had lunch with petitioner on the

21 day and at the time of the alleged drug transaction.  (Id. at 85.)  She also testified that she had

22 never seen petitioner wear a "red and white 49er jersey."  (Id. at 86.)  The prosecutor then

23 showed Ms. Queza the booking photo and asked whether she recognized petitioner.  (Id. at 88.)

24 She answered "yes."  (Id.)  The prosecutor then asked, "And you see what he's wearing there.

25 Isn't that the top of a red in color 49er's jersey?"  (Id.)  Ms. Queza responded, "It looks like it,

26 /////

1 but I don't know." (Id.)  Ms. Queza further testified that she had never seen petitioner wearing

2 the red shirt that appeared in the booking photo.  (Id. at 89.)

3          Petitioner argues that the booking photo does not clearly show the shirt he was

4 wearing because "one can barely see the top of petitioner's shoulders."  (Pet'r's Exs. at 36.)[3]

5 Petitioner explains that the prosecution's failure to produce this photo in discovery earlier

6 prevented him from

7              all cross-examination showing that this was not a 49er shirt
             petitioner was wearing in the booking photo, that the booking
8              photo appeared to be cropped up to where one cannot see more of
             the shirt, so one could see for themselves that this was not a red
9              49er shirt that petitioner was wearing in the booking photo.  This
             denied petitioner the opportunity to prepare and present a defense
10             to counter attack the April 12, 2002 booking photo/discovery
             violation.

11

12 (Pet. at 37.)  Petitioner is apparently claiming that if he had obtained the booking photo in

13 discovery, he could have rebutted the prosecutor's assertion that at the time he was arrested he

14 was wearing the same "49er" jersey described by the police as being worn by the perpetrator.  He

15 frames this claim as a violation of his "right to discovery" by either the trial court or the

16 prosecutor.  (Id. at 54.)

17          Petitioner raised this claim for the first time in his petition for a writ of habeas

18 corpus filed in the Solano County Superior Court.  (Id. at 3, 4B.)  As described in more detail

19 below, the Superior Court rejected all of petitioner's claims, except his claims of ineffective

20 assistance of counsel, on the grounds that they should have been raised on appeal.  Because the

21 Superior Court did not reach the merits of petitioner's claim of a violation of the "right to

22 discovery," this court will evaluate the claim de novo.  Nulph, 333 F.3d at 1056.

23          The United States Supreme Court has held "that the suppression by the

24 prosecution of evidence favorable to an accused upon request violates due process where the

25  _____

26          [3]  A review of the photograph in question reflects that a portion of petitioner's shirt is
visible near his shoulder area.  (Id. at 140.)

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Brady v. Maryland, 373 U.S. 83, 87 (1963).  See also Youngblood v. West Virginia, 547 U.S. 867, 869 (2006) ("A Brady violation occurs when the government fails to disclose evidence materially favorable to the accused").  The duty to disclose such evidence is applicable even though there has been no request by the accused, United States v. Agurs, 427 U.S. 97, 107 (1976), and encompasses impeachment evidence as well as exculpatory evidence. United States v. Bagley, 473 U.S. 667, 676 (1985).  There are three components of a Brady violation:  "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  See also Banks v. Dretke, 540 U.S. 668, 691 (2004); Silva v. Brown, 416 F.3d 980, 985 (9th Cir. 2005).  In order to establish prejudice, petitioner must demonstrate that "'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense."  Strickler, 527 U.S. at 289.  "The question is not whether petitioner would more likely than not have received a different verdict with the evidence, but whether "in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  Id. (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)).  See also Silva, 416 F.3d at 986 ("a Brady violation is established where there 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'")  Once the materiality of the suppressed evidence is established, no further harmless error analysis is required.  Kyles, 514 U.S. at 435-36; Silva, 416 F.3d at 986.

On the other hand, "[t]here is no general constitutional right to discovery in a criminal case, and Brady did not create one."  Weatherford v. Bursey, 429 U.S. 545, 559 (1977). See also United States v. Fort, 478 F.3d 1099, 1102 (9th Cir. 2007) (same).  The Due Process

/////

1  Clause "has little to say regarding the amount of discovery which the parties must be afforded[.]"

2  Wardius v. Oregon, 412 U.S. 470, 474 (1973).

3          Petitioner has failed to demonstrate a Brady violation or a violation of any "right

4  to discovery."  Even if there were a federal constitutional right to discovery in a criminal

5  proceeding, petitioner has failed to demonstrate that the trial court or the prosecutor received,

6  ignored, or denied a request for discovery of the booking photo.  Accordingly, there was no

7  violation of any discovery rules.  With respect to any potential Brady claim, petitioner has failed

8  to establish that the booking photo was exculpatory.  Although the court's copy of the photo is in

9  black and white, petitioner informs the court that when he was arrested he was wearing a red

10  jersey with numbers on the front and back.  (See Pet. at 86.)  In these respects, petitioner's shirt

11  was very similar to the shirt described by police as having been worn by the person who sold

12  narcotics to Officer Espinoza.  (See Answer, Ex. 15 at 88-89.)  Therefore, even assuming as

13  petitioner suggests that the shirt in the booking photo does not look like or is not a San Francisco

14  49ers jersey, the photo is not necessarily exculpatory evidence in this case.

15          Moreover, there is also no indication that the photo was suppressed by the

16  prosecutor, either willfully or inadvertently.  Indeed, petitioner was aware that his photograph

17  was taken at the time he was arrested and could have obtained a copy of it.  See Carter v. Bell,

18  218 F.3d 581, 601 (6th Cir. 2000) ("there is no Brady violation if the defendant knew or should

19  have known the essential facts permitting him to take advantage of the information in question,

20  or if the information was available to him from another source").  Finally, petitioner has failed to

21  demonstrate prejudice.  There is no reasonable probability that the result of the trial would have

22  been different had the "booking photo" been disclosed to the defense prior to trial, nor does the

23  photo put the case in such a different light so as to undermine confidence in the verdict.  For

24  these reasons, petitioner is not entitled to relief on his claim that his "right to discovery" was

25  violated by the failure to provide the defense a copy of his "booking photo" in pre-trial discovery.

26  /////

B. Identification Procedure

Petitioner claims that the procedure whereby Detective Espinoza identified him as the person who sold narcotics to her was a "tainted identification procedure" that "led to a mistaken identification of petitioner" and violated his right to due process.  (Pet. at 52, 56-60.)

Petitioner raised this claim for the first time in his petition for a writ of habeas corpus filed in the Solano County Superior Court.  (Id. at 3, 4B.)  As previously noted, the Superior Court rejected all of petitioner's claims, except his claims of ineffective assistance of counsel, on the grounds that they should have been raised on appeal.  Because the Superior Court did not reach the merits of this claim, this court must evaluate the claim de novo.  Nulph, 333 F.3d at 1056.

As described above, after undercover Officer Espinoza conducted the drug transaction, she "drove off, advising Fairfield Police Detective Nipper via radio wire-transmission of the completed transaction and a description of the two men."  (Opinion at 2.) Officer Espinoza described the person from whom she purchased the narcotics as a white male adult with medium build, about six feet tall and weighing 200 pounds, and wearing jeans and a red 49ers jersey shirt with the number 8 on it.  (Answer, Ex. 15 at 19, 23.)

After Officer Espinoza left the scene, Officer Gagliardo entered the parking lot and searched for any persons fitting the description provided by Officer Espinoza.  (Id. at 40, 50.) Gagliardo spoke with Nichols and, while he did not speak with petitioner, he observed him standing a short distance away.  (Id.)  Officer Gagliardo recognized petitioner because he had seen him before.  (Id.)  Gagliardo filled out field identification cards at the time he made contact with petitioner and Nichols.  (Id. at 41.)  One of those cards identified petitioner as one of the suspects.  (Id. at 54-56; Pet'r's Exs. at 316.)  Petitioner was described as a black male with black hair, but the other characteristics described on the card fit petitioner's description as contained on his booking photo.  (Answer, Ex. 15 at 54-56; Pet'r's Exs. at 14, 316.)  The field identification card also noted that petitioner was wearing a "red #8 49ers jersey." (Pet'r's Exs. at 316.)  These

10

1   facts were related at petitioner's trial by Officer Nipper.  Officer Gagliardo did not testify

2   because at the time of petitioner's trial he was on active duty with the United States Marines.

3   (Answer, Ex. 15 at 41.)

4           While Officer Gagliardi was contacting the suspects in the field, Officer Espinoza

5   was shown a binder of over 100 photographs of possible suspects by Detective Nipper, but was

6   unable to identify anyone.  (Id. at 23-25, 31-32, 43.)  The binder did not contain photographs of

7   petitioner or Nichols.  (Id. at 43.)  Officer Espinoza subsequently went to the Fairfield Police

8   Department, where Officer Nipper showed her a photograph of Mr. Nichols and a photograph of

9   petitioner.  (Id. at 32.)  Officer Nipper obtained these photographs from the "mug shots" data

10   base after Officer Gagliardi identified petitioner and Nichols as the persons he observed  at the

11   scene.  (Id. at 45.)  Detective Espinoza identified both men as having been involved in the drug

12   buy.  (Id., 34-35.)  In addition, Officers Espinoza and Nipper identified petitioner in court as the

13   person who tried to sell narcotics to Officer Espinoza.  (Id. at 25-26, 46-47.)

14           Petitioner claims that the above-described procedure whereby he was identified as

15   the perpetrator was unduly suggestive and violated his right to due process.  He makes several

16   arguments in support of this claim.  First, he argues that he did not receive the protections

17   required during a legitimate "photo or physical lineup."  (Pet. at 52, 56-60.)  He notes that his

18   trial counsel was not present at the "single photo identification process of petitioner."  (Id. at 57.)

19   Petitioner also questions the veracity of Officer Espinoza, noting that she testified the baggie

20   given to her by the perpetrator contained a "powdery substance," (Pet'r's Exs. at 152), whereas

21   another prosecution witness testified that after testing the substance inside the baggie, it

22   contained a "tan chunky material."  (Pet'r's Exs. at 148.)  Petitioner points to several other

23   instances during Officer Espinoza's testimony which he contends were inconsistent with regard

24   to "where the crime took place."  (Pet. at 57; Pet'r's Exs. at 60-62, 157.)  Petitioner finds it

25   suspicious that the booking photo from which Officer Espinoza identified him contained the

26   "exact information" that Officer Gagliardi included in his in-field identification notes.  (Pet. at

57-58.)  Finally, petitioner notes that the tape recording containing Officer Espinoza's description

of the perpetrator was largely unintelligible and that he was unable to cross-examine Officer

Gagliardi about his in-field notes indicating that the person who sold the narcotics to Officer

Espinoza was a "Black man."  (Id. at 58; Answer, Ex. 15 at 34, 36.)

The Due Process Clause of the United States Constitution prohibits the use of

identification procedures which are "unnecessarily suggestive and conducive to irreparable

mistaken identification."  Stovall v. Denno, 388 U.S. 293, 302 (1967), overruled on other

grounds by Griffith v. Kentucky, 479 U.S. 314, 326 (1987) (discussing retroactivity of rules

propounded by Supreme Court).  A suggestive identification violates due process if it was

unnecessary or "gratuitous" under the circumstances.  Neil v. Biggers,  409 U.S. 188, 198 (1972).

See also United States v. Love, 746 F.2d 477, 478 (9th Cir. 1984) (articulating a two-step process

in determining the constitutionality of pretrial identification procedures: first, whether the

procedures used were impermissibly suggestive and, if so, whether the identification was

nonetheless reliable).  Each case must be considered on its own facts and whether due process

has been violated depends on "'the totality of the circumstances' surrounding the confrontation."

Simmons v. United States, 390 U.S. 377, 383 (1968).  See also Stovall, 388 U.S. at 302.

An identification procedure is suggestive where it "[i]n effect . . . sa[ys] to the

witness 'This is the man.'"  Foster v. California, 394 U.S. 440, 443 (1969).  One-on-one

identifications are suggestive.  See Stovall, 388 U.S. at 302.  However, "the admission of

evidence of a showup without more does not violate due process."  Biggers, 409 U.S. at 198.

One-on-one identifications are sometimes necessary because of officers' and suspects' strong

interest in the expeditious release of innocent persons and the reliability of identifications made

soon after and near a crime.  See, e.g., United States v. Kessler, 692 F.2d 584, 585 (9th Cir.

1982); United States v. Coades, 549 F.2d 1303, 1305 (9th Cir. 1977).

If the flaws in the pretrial identification procedures are not so suggestive as to

violate due process, "the reliability of properly admitted eyewitness identification, like the

12

1    credibility of the other parts of the prosecution's case is a matter for the jury." Foster v.

2    California, 394 U.S. 440, 443 n.2 (1969). See also Manson v. Brathwaite 432 U.S. 98, 116

3    (1977) ("[j]uries are not so susceptible that they cannot measure intelligently the weight of

4    identification testimony that has some questionable feature").  On the other hand, if an

5    out-of-court identification is inadmissible due to unconstitutionality, an in-court identification is

6    also inadmissible unless the government establishes that it is reliable by introducing "clear and

7    convincing evidence that the in-court identifications were based upon observations of the suspect

8    other than the lineup identification." United States v. Wade, 388 U.S. 218, 240 (1967). See also

9    United States v. Hamilton, 469 F.2d 880, 883 (9th Cir. 1972) (in-court identification admissible,

10   notwithstanding inherent suggestiveness, where it was obviously reliable).

11           Factors indicating the reliability of an identification include: (1) the opportunity to

12   view the criminal at the time of the crime; (2) the witness's degree of attention (including any

13   police training); (3) the accuracy of the prior description; (4) the witness's level of certainty at the

14   confrontation; and (5) the length of time between the crime and the identification. Manson, 432

15   U.S. at 114 (citing Biggers, 409 U.S. at 199-200)).  Additional factors to be considered in making

16   this determination are "the prior opportunity to observe the alleged criminal act, the existence of

17   any discrepancy between any pre-lineup description and the defendant's actual description, any

18   identification prior to lineup of another person, the identification by picture of the defendant prior

19   to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between

20   the alleged act and the lineup identification."  388 U.S. at 241, 87 S. Ct. at 1940.  The "central

21   question," however, is "whether under the 'totality of the circumstances' the identification is

22   reliable even though the confrontation procedure was suggestive." Biggers, 409 U.S. at 199.

23           Even assuming that the identification procedure used here was suggestive, the

24   undersigned concludes that the in-court identification was nonetheless reliable because it was not

25   especially likely to yield an "irreparable misidentification." Manson, 432 U.S. at 116 (internal

26   quotation and citation omitted); Kessler, 692 F.2d at 586-87 (unless the procedure used is so

1   suggestive that it raises a "very substantial likelihood of irreparable misidentification," doubts go

2   to the weight, not the admissibility, of the evidence) (internal quotation and citation omitted).

3   Given the fact that Detective Espinoza was a trained undercover law enforcement officer who

4   had just seen petitioner at close range and identified him within thirty minutes after he sold her

5   the narcotics, along with the fact that petitioner met the description of the perpetrator that

6   Detective Espinoza gave immediately after the drug sale, this court cannot find that Detective

7   Espinoza's in-court identification of petitioner was so unreliable that its admission into evidence

8   violated petitioner's constitutional rights.  Notwithstanding petitioner's challenges to the

9   identification procedure described above, this court cannot conclude that the procedure resulted

10   in a "very substantial likelihood of irreparable misidentification." Kessler, 692 F.2d at 586-87.)

11          Petitioner's suggestion that he was entitled to a "lineup" is also unpersuasive.

12   There is no constitutional right to a lineup. United States v. Robertson, 606 F.2d 853, 857 (9th

13   Cir. 1979); see also Sumner v. Mata, 446 U.S. 1302, 1305-06 (1980) (staying the Ninth Circuit's

14   decision that the availability of "less suggestive procedures" warranted granting a habeas petition

15   and finding the Ninth Circuit's analysis to be in tension with the Supreme Court's decision in

16   Manson and contrary to precedent from other circuits).  Accordingly, petitioner is not entitled to

17   relief on these claims.

18              C.  Prosecutorial Misconduct

19          Petitioner's next claim is that the prosecutor committed misconduct at trial when

20   he: (1) allowed prosecution witness Detective Nipper to sit next to him during jury selection,

21   opening statements, and the testimony of Officers Bowden and Espinoza, because this "allowed

22   Jeremy Nipper to familiarize and memorize prosecution witnesses testimony;" (2) "slid

23   exculpatory evidence (statement made by Detective Espinoza stating petitioner had not sold her

24   anything) into the bottom of the file he had sitting on his desk," which denied petitioner access to

25   evidence that could have "proved his innocence;" (3) insinuated several times that petitioner had

26   altered his appearance by shaving his head and wearing glasses, which "planted a thought in the

mind of the jury that petitioner was attempting to fool the prosecutions eye witness into believing

that she identified the wrong person;" (4) agreed to allow the jury to hear the unintelligible

audiotape of Officer Espinoza's description of the perpetrator instead of having the tape

transcribed, which "denied petitioner adequate appellate review concerning this key evidence;"

(5) recalled Officer Nipper to reiterate testimony he had previously given regarding his actions in

retrieving petitioner's picture to show Officer Espinoza, which "enabled the prosecution to

parade the courtroom with repetitive testimony;" (6) admitted into evidence petitioner's "booking

photo," which had not been given to the defense during discovery; (7) misrepresented that

petitioner was wearing a red 49er's jersey containing the number 8 in the booking photo; (8) used

the booking photo in his cross-examination of Laura Quezada and in his closing argument; (9)

used the "negative word 'regurgitate'" to describe petitioner's trial, which "th[rew] a negative

outlook on petitioner's entire jury trial;" (10) minimized contradictions in the trial testimony

concerning whether the narcotics sold to Officer Espinoza looked "chunky" or "powdery," which

"allowed the prosecution the opportunity to tie up its loose ends with speculation which was not

supported by the evidence," (11) stated during his closing argument that Officer Gagliardo did

not have to walk up to petitioner to identify him because petitioner was a "known quantity,"

which "made it look like petitioner had contact with the police all of the time which was purely

speculation;" (12) stated several times in his closing argument that there was no other evidence

from which the jury could infer that the perpetrator was someone other than petitioner, which

"allowed the prosecution to monopolize the entire trial in one sentence, that was pure speculation

and not in evidence;" (13) argued in his closing that some of the statements made by defense

witness Ms. Queza were "pure speculation and not in evidence," which "cast doubt on

petitioner's defense;" (14) improperly "brought up petitioner's past criminal history that was not

alleged in the information" and "cited a false prison prior" during the trial on petitioner's prior

convictions; (15) allowed the sentencing judge to sentence petitioner without the benefit of a

/////

1 memo written by the prosecutor; and (16) "took full advantage of petitioner's counsel not making

2 one objection or filing one motion during petitioner's entire trial."  (Pet. at 63-73.)

3          Petitioner raised these claims for the first time in his petition for a writ of habeas

4 corpus filed in the Solano County Superior Court.  (Id. at 3, 4B.)  Again, the Superior Court

5 rejected all of petitioner's claims, except his claims of ineffective assistance of counsel, on the

6 grounds that they should have been raised on appeal.  Because the Superior Court did not reach

7 the merits of this claim, this court must evaluate the claim de novo.  Nulph, 333 F.3d at 1056.

8          A defendant's due process rights are violated when a prosecutor's misconduct

9 renders a trial fundamentally unfair.  Darden v. Wainwright, 477 U.S. 168, 181 (1986).

10 However, such misconduct does not, per se, violate a petitioner's constitutional rights.  Jeffries v.

11 Blodgett, 5 F.3d 1180, 1191 (9th Cir. 1993) (citing Darden, 477 U.S. at 181 and Campbell v.

12 Kincheloe, 829 F.2d 1453, 1457 (9th Cir. 1987)).  Claims of prosecutorial misconduct are

13 reviewed "'on the merits, examining the entire proceedings to determine whether the prosecutor's

14 [actions] so infected the trial with unfairness as to make the resulting conviction a denial of due

15 process.'"  Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995) (citation omitted).  See also

16 Greer v. Miller, 483 U.S. 756, 765 (1987); Turner v Calderon, 281 F.3d 851, 868 (9th Cir. 2002).

17 Relief on such claims is limited to cases in which the petitioner can establish that prosecutorial

18 misconduct resulted in actual prejudice.  Johnson, 63 F.3d at 930 (citing Brecht, 507 U.S. at

19 637-38); see also Darden, 477 U.S. at 181-83; Turner, 281 F.3d at 868.  Put another way,

20 prosecutorial misconduct violates due process when it has a substantial and injurious effect or

21 influence in determining the jury's verdict.  See Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th

22 Cir. 1996).

23          In considering claims of prosecutorial misconduct involving allegations of

24 improper argument the court is to examine the likely effect of the statements in the context in

25 which they were made and determine whether the comments so infected the trial with unfairness

26 as to make the resulting conviction a denial of due process.  Turner, 281 F.3d at 868; Sandoval v.

1    Calderon, 241 F.3d 765, 778 (9th Cir. 2001); see also Donnelly v. DeChristoforo, 416 U.S. 637,

2    643 (1974); Darden, 477 U.S. at 181-83.  In fashioning closing arguments, prosecutors are

3    allowed "reasonably wide latitude," United States v. Birges, 723 F.2d 666, 671-72 (9th Cir.

4    1984), and are free to argue "reasonable inferences from the evidence." United States v. Gray,

5    876 F.2d 1411, 1417 (9th Cir. 1989).  See also Ducket v. Godinez, 67 F.3d 734, 742 (9th Cir.

6    1995).  "[Prosecutors] may strike 'hard blows,' based upon the testimony and its inferences,

7    although they may not, of course, employ argument which could be fairly characterized as foul or

8    unfair." United States v. Gorostiza, 468 F.2d 915, 916 (9th Cir. 1972).

9         After a review of the record, the undersigned concludes that petitioner has failed

10   to demonstrate any prejudice with respect to his various conclusory claims of prosecutorial

11   misconduct.  Whether viewed singly or in concert, the prosecutor's alleged acts of misconduct

12   did not render petitioner's trial fundamentally unfair or render his conviction one based upon the

13   denial of due process.  Accordingly, petitioner is not entitled to habeas relief with respect to these

14   claims.

15         D.  Confrontation Clause

16         Petitioner next claims that his right to confront the witnesses against him was

17   violated because he was unable to cross-examine Officer Gagliardi, who was on active duty in

18   the military at the time of petitioner's trial.  (Pet. at 61, 75-81.)  Specifically, petitioner complains

19   of not being allowed to question Officer Gagliardi about the field identification card which

20   identified petitioner as one of the suspects.  (Id.)  Petitioner points out that Officer Gagliardi

21   identified the person who sold narcotics to Officer Espinoza as a black man, and argues that:

22            the defense could have uncovered that it was not petitioner that
             [Gagliardi] field Ided (sic) on the day in question.  Also the defense
23            could have gotten on record and demonstrated for the jury that
             petitioner was not wearing a red 49er football jersey on the day of
24            his arrest on April 12, 2002.

25   Id. at 80.)  Petitioner argues that his inability to question Officer Gagliardi at trial denied him the

26   opportunity to fully present his defense of mistaken identity, and he notes that "petitioner's

17

1  counsel was only able to elicit second hand testimony concerning the events in question instead

2  of first hand reliable, quality testimony that he was entitled to." (Id. at 76.)

3         Petitioner also claims that his right to confront the witnesses against him was

4  violated by his counsel's failure to call Lavelle Nichols as a witness at his trial.  Petitioner argues

5  that his inability to question Nichols led to the admission of incriminating testimony implicating

6  petitioner in the crime "without any adversarial testing or careful scrutiny upon its introduction

7  and admittance during petitioner's jury trial." (Id. at 76-77.)

8         The Sixth Amendment to the United States Constitution grants a criminal

9  defendant the right "to be confronted with the witnesses against him."  U.S. Const. amend. VI.

10  In 2004, the United States Supreme Court held that the Confrontation Clause bars the state from

11  introducing into evidence out-of-court statements which are testimonial in nature unless the

12  witness is unavailable and the defendant had a prior opportunity to cross-examine the witness,

13  regardless of whether such statements are deemed reliable.  Crawford v. Washington, 541 U.S.

14  36 (2004).[4]

15         Confrontation Clause violations are subject to harmless error analysis.  Holley v.

16  Yarborough, ___ F.3d ___, No. 08-15104, 2009 WL 1667867, at *7 (9th Cir. June 16, 2009);

17  Whelchel v. Washington, 232 F.3d 1197, 1205-06 (9th Cir. 2000).  "In the context of habeas

18  petitions, the standard of review is whether a given error 'had substantial and injurious effect or

19  influence in determining the jury's verdict.'" Christian v. Rhode, 41 F.3d 461, 468 (9th Cir.

20  1994) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).  See also Holley 2009 WL

21  1667867 at *7 (same).  Factors to be considered when assessing the harmlessness of a

22  Confrontation Clause violation include the importance of the testimony, whether the testimony

23  was cumulative, the presence or absence of evidence corroborating or contradicting the

24  /////

25

26      [4]  The holding in Crawford applies to this case because it was decided prior to petitioner's
appeal.  Winzer v. Hall, 494 F.3d 1192, 1194 (9th Cir. 2007).

1  testimony, the extent of cross-examination permitted, and the overall strength of the

2  prosecution's case.  Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).[5]

3          Assuming arguendo that petitioner did not waive his Confrontation Clause claim

4  by failing to object to the testimony of Officer Nipper regarding the identification card filled out

5  by Officer Gagliardi, it appears that petitioner's inability to cross-examine Officer Gagliardi

6  about the making of the field identification report violated petitioner's right to confront the

7  witnesses against him.  See Melendez-Diaz v. Massachusetts, ___ U.S. ___, No. 07-591, 2009

8  WL 1789468, at *8-13 (June 25, 2009) (admission of certificates of laboratory analysts without

9  the testimony of the analysts themselves violated petitioner's right to confront the witnesses

10  against him).  However, any such error was harmless under the circumstances of this case.

11         Here, the trial testimony given by Officer Nipper regarding the identification card

12  filled out by Officer Gagliardi was actually helpful to petitioner's defense.  Specifically,

13  petitioner's trial counsel pointed out during his cross-examination of Officer Nipper that Officer

14  Gagliardi identified a black man as the perpetrator, and he argued during his closing argument

15  that the person Officer Gagliardi observed may have been black.  (Answer, Ex. 15 at 50, 105.)

16  Defense counsel also insinuated that Officer Gagliardi had simply filled out the field

17  identification card using the information he got from petitioner's booking photo, and not from his

18  personal observation.  (Id. at 57-58.)

19         In addition it must be noted that here, the prosecution's case against petitioner was

20  strong.  Officer Espinoza, who was present during the drug transaction, identified petitioner from

21  his photograph and also at trial as the person who sold her the narcotics.  She, and not officer

22  Gagliardi, was the central witness at petitioner's trial because she was the only person to have

23  observed petitioner while the drug transaction was taking place.  Petitioner was provided a full

24

25      _____

26      [5]  Although Van Arsdall involved a direct appeal and not a habeas action, "there is
nothing in the opinion or logic of Van Arsdall that limits the use of these factors to direct
review."  Whelchel, 232 F.3d at 1206.

1  opportunity to cross-examine this critical witness at his trial.  (Id. at 28-35.)  Under these

2  circumstances, any error in admitting into evidence the field identification card generated by

3  Officer Gagliardi and the trial testimony of Officer Nipper about that card would not have had a

4  "substantial and injurious effect or influence in determining the jury's verdict."  Brecht 507 U.S.

5  at 637.

6          On the other hand, petitioner's right to confrontation was not violated by his

7  inability to question Lavelle Nichols.  A witness is considered to be a witness "against" a

8  defendant for purposes of the Confrontation Clause if his testimony "is part of the body of

9  evidence that the jury may consider in assessing his guilt."  Cruz v. New York, 481 U.S. 186, 190

10 (1987).  Mr. Nichols was not called as a witness at petitioner's trial by any party and was

11 therefore not a witness "against" petitioner in any respect.  See also Melendez-Diaz, 2009 WL

12 1789468 at *5.

13         For the foregoing reasons, petitioner is not entitled to relief on his claims brought

14 pursuant to the Confrontation Clause.

15         E.  New Evidence

16         Petitioner's next claim is that "new evidence" demonstrates he did not commit the

17 crime for which he was convicted.  (Pet. at 82-87.)  The "new evidence" referred to is petitioner's

18 own declaration in which he states that he was not wearing a red 49ers jersey when the April 12,

19 2002 "booking photo" was taken, but rather a "red players baseball style jersey with the numbers

20 69 on the front and back."  (Id. at 86.)  Petitioner alleges that the booking photo has been

21 "cropped" to obscure the fact that petitioner's clothing did not match that worn by the actual

22 perpetrator.  (Id. at 84.)

23         Petitioner raised this claim for the first time in his petition for a writ of habeas

24 corpus filed in the Solano County Superior Court.  (Id. at 3, 4B.)  As described above, that court

25 rejected all of petitioner's claims, except his ineffective assistance of counsel claims, on the

26 /////

1    grounds that they should have been raised on appeal.  Because the Superior Court did not reach

2    the merits of this claim, this court must evaluate the claim de novo.

3           In Herrera v. Collins, 506 U.S. 390 (1993), a capital case, a majority of the

4    Supreme Court assumed without deciding that the execution of an innocent person would violate

5    the Constitution.  A different majority of the Supreme Court explicitly so held.  Compare 506

6    U.S. at 417 with 506 U.S. at 419 and 430-37.  See also House v. Bell, 547 U.S. 518, 555 (2006)

7    (declining to resolve whether federal courts may entertain claims of actual innocence but

8    concluding that the petitioner's showing of innocence in that case fell short of the threshold

9    suggested by the Court in Herrera); Jackson v. Calderon, 211 F.3d 1148, 1164 (9th Cir. 2000);

10   Carriger v. Stewart, 132 F.3d 463, 476 (9th Cir. 1997) (en banc).  Although the Supreme Court

11   did not specify the standard applicable to this type of "innocence" claim, it noted that the

12   threshold would be "extraordinarily high" and that the showing would have to be "truly

13   persuasive." Herrera, 506 U.S. at 417.  See also House, 547 U.S. at 555; Carriger, 132 F.3d at

14   476.  The Ninth Circuit has determined that in order to be entitled to relief on such a claim a

15   petitioner must affirmatively prove that he is probably innocent.  Jackson, 211 F.3d at 1165;

16   Carriger, 132 F.3d at 476-77.

17          A habeas petitioner's claim of actual innocence must be supported "with new

18   reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness

19   accounts, or critical physical evidence – that was not presented at trial."  Schlup v. Delo, 513

20   U.S. 298, 324 (1995).  To prevail, a petitioner making an actual innocence claim "must show

21   that, in light of all the evidence, including evidence not introduced at trial, 'it is more likely than

22   not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'"

23   Majoy v. Roe, 296 F.3d 770, 776 (9th Cir. 2002) (quoting Schlup, 513 U.S. at 327).

24          Even assuming arguendo that a claim of actual innocence is cognizable in this

25   non-capital case, petitioner has failed to make the required showing.  Petitioner's declaration to

26   the effect that he was not wearing a red 49ers jersey but rather a different red sports jersey when

21

1  the booking photo was taken does not demonstrate that he is probably innocent of the crime for

2  which he was convicted.  Accordingly, he is not entitled to relief on this claim.

3  F.  Ineffective Assistance of Trial Counsel

4  Petitioner raises numerous claims alleging that his trial counsel rendered

5  ineffective assistance.  After setting forth the applicable legal principles, the court will evaluate

6  these claims in turn below.

7  1. Legal Standards

8  The Sixth Amendment guarantees the effective assistance of counsel.  The United

9  States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

10  Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

11  counsel, a petitioner must first show that, considering all the circumstances, counsel's

12  performance fell below an objective standard of reasonableness.  466 U.S. at 687-88.  After a

13  petitioner identifies the acts or omissions that are alleged not to have been the result of

14  reasonable professional judgment, the court must determine whether, in light of all the

15  circumstances, the identified acts or omissions were outside the wide range of professionally

16  competent assistance.  Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  Second, a

17  petitioner must establish that he was prejudiced by counsel's deficient performance.  Strickland,

18  466 U.S. at 693-94.  Prejudice is found where "there is a reasonable probability that, but for

19  counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at

20  694.  A reasonable probability is "a probability sufficient to undermine confidence in the

21  outcome."  Id.  See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981

22  (9th Cir. 2000).  A reviewing court "need not determine whether counsel's performance was

23  deficient before examining the prejudice suffered by the defendant as a result of the alleged

24  deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of

25  sufficient prejudice . . . that course should be followed."  Pizzuto v. Arave, 280 F.3d 949, 955

26  (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

1    An attorney's failure to make a meritless objection or motion does not constitute

2  ineffective assistance of counsel.  Jones v. Smith, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000) (citing

3  Boag v. Raines, 769 F.2d 1341, 1344 (9th Cir. 1985)).  See also Rupe v. Wood, 93 F.3d 1434,

4  1445 (9th Cir. 1996) ("the failure to take a futile action can never be deficient performance").

5  "To show prejudice under Strickland resulting from the failure to file a motion, a defendant must

6  show that (1) had his counsel filed the motion, it is reasonable that the trial court would have

7  granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would

8  have been an outcome more favorable to him."  Wilson v. Henry, 185 F.3d 986, 990 (9th Cir.

9  1999) (citing Kimmelman, 477 U.S. at 373-74) (so stating with respect to failure to file a motion

10  to suppress on Fourth Amendment grounds)).  See also Van Tran v. Lindsey, 212 F.3d 1143,

11  1156-57 (9th Cir. 2000) (no prejudice suffered as a result of counsel's failure to pursue a motion

12  to suppress a lineup identification), overruled on other grounds by Lockyer v. Andrade, 538 U.S.

13  63 (2003).

14    In assessing an ineffective assistance of counsel claim "[t]here is a strong

15  presumption that counsel's performance falls within the 'wide range of professional assistance.'"

16  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting Strickland, 466 U.S. at 689).  There

17  is in addition a strong presumption that counsel "exercised acceptable professional judgment in

18  all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing

19  Strickland, 466 U.S. at 689).

20    2.  Petitioner's Claims

21    Below, the court will describe petitioner's many claims concerning the alleged

22  ineffectiveness of his trial counsel, in the order in which they are presented in the petition.

23    Petitioner first claims that, eight days prior to the "speedy trial deadline," his trial

24  counsel had failed to supply him with "[counsel's] business card, preliminary hearing transcript,

25  police reports, arraignment papers, statements," and had failed to file any pre-trial motions.  (Pet.

26  at 8.)  Petitioner alleges that he was "unable to confer with counsel to discuss strategy and facts,

1   thus preventing petitioner from gaining insight into the allegations against him." (Id. at 10.)

2   Petitioner explains that he tried to contact counsel to discuss various aspects of his case, but that

3   he was unable to reach him. (Id. at 11-12.) Petitioner also appears to claim that his right to a

4   speedy trial was violated by his trial counsel's request for a competency evaluation. (Id. at 12-

5   14.)[6]

6           Petitioner argues that the above-described failures of his trial counsel resulted in

7   prejudice because: (1) he did not receive a speedy trial, "resulting in defense witnesses lapse of

8   memory during trial;" (2) Officer Gagliardi became unavailable to testify because of his

9   deployment by the United States Marines; (3) petitioner was "forced to endure oppressive pre[-]

10  trial incarceration;" (4) petitioner was admitted to Atascadero State Hospital "with his case

11  unresolved;" and (5) petitioner's "motions" were not "heard or acted on." (Id. at 14.)

12          Petitioner further alleges that after criminal proceedings against him were

13  reinstated on November 22, 2002, his trial counsel rendered ineffective assistance by: (1) failing

14  to subpoena (a) "witnesses and other evidence;" (b) Officer Gagliardi; (c) the "arresting officers;"

15  and (d) the "players jersey" petitioner was wearing on the day of his arrest; (2) failing to file

16  motions requested by petitioner, such as a so-called "Pitchess" motion for police personnel

17  records and a motion to dismiss the indictment based on "an unduly suggestive photo

18  identification procedure;" (3) allowing the misdemeanor charges to stand, even though petitioner

19  had served the maximum sentence allowable; (4) failing to have experts independently test the

20  "contraband in question;" (5) failing to discuss "bifurcation proceedings" with petitioner; (6)

21  failing to subpoena witnesses to the "illegal search in this matter;" (7) failing to explain the

22  defense strategy to petitioner; (8) asking petitioner to "have someone be willing to give perjured

23

24          [6] On appeal, petitioner argued that "substantial evidence did not support the trial court's
    decision to suspend criminal proceedings in order to determine his competency pursuant to Penal
25  Code section 1368, and as a result his speedy trial rights were violated." (Answer, Ex. 5 at 1.)
    Petitioner does not make that claim in the instant petition. Accordingly, this court will not
26  address such a claim of insufficiency of the evidence.

1  testimony to reflect I was with them on the date and time in question;" and (9) failing to give

2  petitioner any information about Lavelle Nichols or to question why Nichols was not present at

3  petitioner's trial.  (Id. at 15-18.)

4      Petitioner also claims that his trial counsel rendered ineffective assistance by

5  failing to introduce into evidence "thirteen itemized packets with exhibits," which were provided

6  to counsel by petitioner.  (Id. at 18.)  Those packets allegedly demonstrated "inconsistencies" in

7  the testimony of the prosecution witnesses regarding their description of the person who tried to

8  sell the narcotics to Officer Espinoza, the location of the drug transaction, the description of the

9  narcotics sold, the details of the drug transaction, and the reliability of the remote listening device

10 used by the police in monitoring the transaction.  (Id. at 18-20.)  Petitioner notes, for example,

11 that Detective Espinoza testified at trial that she bought narcotics from a white male, whereas the

12 field identification report generated by Officer Gagliardi stated that a black male was involved.

13 (Id. at 18; Pet'r's Exs. at 237, 316.)  Petitioner contends that his trial counsel's failure to present

14 the evidence contained in the packets "let go several perfectly effective impeachment strategies

15 that could have won petitioner an acquittal to the charge against him."  (Id. at 20.)

16     Petitioner states that he sent his trial counsel a chart "mapping out eleven

17 inconsistencies in the prosecution case" and that his right to participate in his own defense was

18 violated when counsel did not make use of the chart at his trial.  (Id.; Pet'r's Exs. at 221.)

19 Petitioner also alleges, generally, that his trial counsel's failure to present a motion for discovery

20 drafted by petitioner and refusal to use defense strategies developed by petitioner, prevented

21 petitioner from participating in his defense and winning an acquittal thereby violating petitioner's

22 "right to discovery."  (Pet. at 20-21.)

23     Petitioner complains that his trial counsel raised no objection when prosecution

24 witness Officer Nipper was allowed to sit next to the prosecutor during jury selection and the

25 presentation of evidence at trial.  (Id. at 21.)  Petitioner also complains that his trial counsel did

26 not challenge numerous jurors because of their ties to law enforcement, the government, or

1  careers in bio-science  (Id. at 22-25.)[7]  Petitioner contends that trial counsel's failure to challenge

2  these prospective jurors resulted in a biased jury, consisting of "five law enforcement officers

3  and one toxologist [sic]."  (Id. at 25.)

4          Petitioner baldly claims that his trial counsel conspired with the prosecutor to hide

5  exculpatory evidence in the form of a statement by Detective Espinoza to the effect that

6  "petitioner had not sold her anything."  (Id.)  He argues that trial counsel improperly failed to

7  cross-examine prosecution Detective Espinoza about several inconsistencies in her testimony.

8  (Id. at 26-28.)  Petitioner argues that this denied him "the valuable opportunity to discredit and

9  impeach the prosecution's only eye witness."  (Id. at 26.)

10          Petitioner also claims that his trial counsel rendered ineffective assistance when

11 he: (1) failed to object to the unduly suggestive procedure whereby Officer Espinoza identified

12 petitioner as the person who sold her narcotics; (2) failed to object to the jury's receipt of an

13 unintelligible transcript of the audiotape wherein Officer Espinoza allegedly described the person

14 who attempted to sell narcotics to her; (3) failed to object to the prosecutor's "buy/walk theory,

15 which was not supported by case law;" (4) failed to call percipient witnesses to the drug buy,

16 such as Officer Gagliardi, and allowed other witnesses to testify to matters they had not directly

17 witnessed; (5) failed to request that the photograph of petitioner that was used by Detective

18 Espinoza to identify the person who sold her narcotics be produced at trial; (6) failed to object

19 when one of the prosecution witnesses was excused and then later recalled, only to testify to the

20 same information; (7) failed to object when the prosecutor asked leading questions; (8) failed to

21 impeach witnesses on inconsistencies between their testimony and other trial testimony on the

22 same subject; (9) elicited testimony from petitioner's alibi witness that was damaging to

23 petitioner's case, to the effect that she witnessed petitioner being arrested by police; (10) failed to

24

25          [7] Petitioner also complains that his counsel failed to object to the trial court's statement
26 to the prospective jury that the prosecutor was alleging "a hand to hand sale of narcotics to a
police officer." (Pet. at 25.)

challenge the introduction into evidence of the "booking photo" that had not been provided to the defense during the discovery process; (11) failed to retrieve petitioner's shirt from his "jail property" in order to show that he was not wearing a red 49er jersey at the time he was apprehended; (12) failed to "get on record that the jury sat in the hallway in front of the courtroom with the prosecution unsupervised for forty minutes," thereby preventing the defense from finding out whether the prosecutor "made incriminating comments about petitioner in front of the jury;" (13) failed to object when the prosecutor told the jury in his closing argument that he was not going to "regurgitate" the trial testimony, thereby throwing a "negative outlook" on petitioner's trial; (14) failed to object to the prosecutor's improper closing argument where he speculated about the reasons for inconsistent trial testimony, made remarks based on speculation, and made false statements about the admitted evidence; (15) made improper statements during his own closing argument to the effect that he had no doubt Detective Espinoza believed petitioner was the person who attempted to sell her narcotics, thereby vouching for the truth of Detective Espinoza's testimony; (16) failed to object when the prosecutor improperly mentioned prior crimes committed by petitioner which should not have been part of the proceedings because they were not charged in the information; (17) failed to object during the sentencing proceedings when the judge sentenced petitioner "off the probation report without having the information;" (18) failed to present sufficient mitigating evidence; (19) failed to make any objections during petitioner's trial, which allowed the prosecution to "conduct its case unchallenged;" and (20) failed to object to the numerous instances of prosecutorial misconduct, discussed above. (Pet. at 26-46; April 25, 2007 "Separate Memorandum Petitioner's Legal Brief in Support of his Amended Petition" (hereinafter Separate Mem.) at 21.)

### 3. State Court Opinion

Petitioner raised these claims in a petition for a writ of habeas corpus filed in the Solano County Superior Court. (Pet. at 3, 4B.) The Superior Court rejected petitioner's claims reasoning as follows:

Petitioner Charles Sanders filed a petition for writ of habeas corpus claiming ineffective assistance from both trial and appellate counsel. Petitioner also includes, as independent claims, those issues that he feels should have been raised by trial and appellate counsel. Specifically, he complains that rules of discovery were violated when the People failed to supply the defense with a booking photo of Petitioner, that he was misidentified through the use of a suggestive identification procedure, that he was prejudiced by various acts of prosecutorial misconduct, and that he was denied the right to cross-examine Officer Gagliardi.

Generally, the writ of habeas corpus cannot serve as a substitute for an appeal. (In re Harris (1993) 5 Cal.4th 813, 829; In re Dixon (1953) 41 Cal.2d 756, 759.) Absent strong justification for the failure to appeal, the writ will not be available of [sic] the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction. (Dixon, 41 Cal.2d at 759.) Therefore, Petitioner may not bring any of his claims independently from his ineffective assistance claims.

Petitioner's allegation that he received ineffective assistance of appellate counsel is based on counsel's failure to raise certain issues on appeal. When raising a claim of ineffective assistance of appellate counsel, Petitioner must demonstrate that there is a reasonable probability that he would have prevailed on appeal. (Smith v. Robbins (2000) 528 U.S. 259, 285.) However, because none of the issues raised by Petitioner had been preserved for appeal, they would not have been successful.

Petitioner has also claimed ineffective assistance of trial counsel. Not only does Petitioner allege that trial counsel failed to preserve issues for appeal, he catalogues a wide range of conduct he felt was inadequate, from doubting Petitioner's competence to stand trial to the contents of counsel's closing arguments. Petitioner has not demonstrated "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Strickland v. Washington (1984) 466 U.S. 668, 694.) Consequently, Petitioner has not stated a prima facie case upon which relief may be granted. (People v. Duvall (1995) 9 Cal.4th 464, 475.)

(Id. at 4(E)-4(F).)

Petitioner subsequently raised these claims in petitions for a writ of habeas corpus filed in the California Court of Appeal and the California Supreme Court. (Id. at 4(A), 4(B).)

Those petitions were summarily denied. (Id. at 4(G), 4(I).)

/////

28

1        4. <u>Analysis</u>

2            This court has carefully reviewed petitioner's allegations and the exhibits

3    submitted in support thereof.  After such review, the court concludes that the decision of the

4    Solano County Superior Court that petitioner has failed to establish prejudice stemming from

5    trial counsel's alleged errors is not contrary to or an unreasonable application of <u>Strickland</u> and

6    should not be set aside.  Petitioner has not demonstrated that any particular motion or objection

7    that he now suggests would have been successful, that counsel acted improperly in raising a

8    question as to petitioner's competency to stand trial, or that any specific witness or evidence that

9    could have arguably been presented on his behalf would have resulted in a different verdict or

10   sentence.

11           To the extent petitioner is arguing that his trial counsel rendered ineffective

12   assistance in failing to insist on petitioner's right to a speedy trial notwithstanding counsel's own

13   doubts about petitioner's competence, this argument should be rejected.  Petitioner's trial counsel

14   certainly did not render ineffective assistance in informing the court that he had serious doubts

15   about petitioner's competence to proceed with the trial.  Indeed, "[a] criminal defendant may not

16   be tried unless he is competent." <u>Godinez v. Moran</u>, 509 U.S. 389, 396 (1993) (quoting <u>Pate v.</u>

17   <u>Robinson</u>, 383 U.S. 375, 378 (1966)).  Trial counsel's doubts were confirmed by both physicians

18   appointed by the trial court to determine whether petitioner was mentally capable of proceeding

19   with the trial.  Further, under California law, when a criminal defendant has come forward with

20   substantial evidence of present mental incompetence he is entitled to a competency hearing as a

21   matter of right. <u>People v. Laudermilk</u>, 67 Cal. 2d 272, 283 (1967).  Delays that occur while a

22   defendant's competence is being investigated do not violate the right to a speedy trial. <u>McNeely</u>

23   <u>v. Blanas</u>, 336 F.3d 822, 829 n.9 (9th Cir. 2003) (delays occurring because of trial counsel's

24   challenges to his client's competency could not be attributed to the state for purposes of the right

25   to a speedy trial); <u>In re Davis</u>, 8 Cal. 3d 798, 809 (1973) ("Prior cases have rejected the

26   contention that the provisions of Penal Code section 1368 et seq., operate to deprive a committed

1  defendant of his right to a speedy trial"); <u>see also</u> <u>United States v. Daychild</u>, 357 F.3d 1082, 1094

2  (9th Cir. 2004) (the time relating to defendant's motion to determine competency excluded from

3  speedy trial deadline).  Under the circumstances presented here, petitioner's trial counsel did not

4  render ineffective assistance in alerting the trial court to his doubts about petitioner's

5  competence.

6           One of petitioner's claims is that his trial counsel filed a "fraudulent psychological

7  evaluation report with the Solano County Superior Court."  (Pet. at 14.)  In support of this

8  argument, petitioner has filed as exhibits two reports signed by Dr. Herb McGrew, one of the

9  physicians on whose opinion the trial court relied in suspending the trial proceedings and

10  ordering petitioner committed to Atascadero State Hospital.  In the first such report, dated July

11  26, 2002, and reflecting a stamp indicating it was filed in the Solano County Courts, Dr. McGrew

12  concludes that "a finding of incompetency would be appropriate."  (Pet'r's Exs. at 25-27.)  The

13  other report, dated October 10, 2003, but not reflecting a file stamp, is identical with the first

14  document except that Dr. McGrew concludes that because petitioner "is not *obviously* seriously

15  disturbed and eager to proceed, I'll have to give him the benefit of the doubt and opine that he is,

16  however marginally, competent to do so.  A PC 1370 is not indicated."  (<u>Id.</u> at 28-30.)  Petitioner

17  argues that the second report dated October 10, 2003, is the "psychological evaluation report that

18  Dr. Herb McGrew actually wrote and signed."  (Pet. at 14.)  Petitioner contends that his

19  placement in Atascadero State Hospital for evaluation was therefore based, in part, on the first,

20  fraudulent, report.  (<u>Id.</u> at 15.)

21           The Reporter's Transcript on Appeal indicates that the trial judge relied on Dr.

22  McGrew's report dated July 26, 2002, along with the report by Dr. Purviance, in concluding that

23  petitioner was incompetent to proceed with the trial.  (Pet'r's Exs. at 42-43; Answer, Ex. 11.)

24  There is no evidence in the record that the July 26, 2002 report is fraudulent or unreliable, and

25  there is certainly no evidence whatsoever that it was "fabricated by trial counsel."  (Separate

26  Mem. at 16, 19.)  On the other hand, the October 10, 2003 report is dated nearly one year after

30

petitioner was convicted, and therefore could not have been written for the purpose of establishing whether petitioner was competent at the time of his trial.  Petitioner has failed to make any showing that his trial counsel committed any error or impropriety in connection with the report submitted to the trial court by Dr. McGrew.

Petitioner has also failed to demonstrate that his trial counsel acted unethically by suppressing exculpatory evidence or rendered ineffective assistance in declining to structure the defense case in accordance with petitioner's wishes or by declining to file motions drafted by petitioner.  See Faretta v. California, 422 U.S. 806, 812 1975) ("[t]he appointed counsel manages the lawsuit and has the final say in all but a few matters of trial strategy"); Brookhart v. Janis, 384 U.S. 1, 8 1966) ("a lawyer may properly make a tactical determination of how to run a trial in the face of his client's incomprehension or even explicit disapproval"); Kuhl v. United States, 370 F.2d 20, 27 (9th Cir. 1966) ("[o]ne of the surest ways for counsel to lose a lawsuit is to permit his client to run the trial"); United States v. Padilla, 819 F.2d 952, 956 (10th Cir. 1987) ("[t]he Sixth Amendment provides no right to counsel blindly following a defendant's instructions").  In addition, most of petitioner's allegations against his trial counsel are vague and conclusory.  "'Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.'" Jones v. Gomez, 66 F.3d 199, 204 (9th Cir. 1995) ((quoting James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994)).

In short, there is no reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 446 U.S. at 694. Accordingly, petitioner is not entitled to relief on his claims of ineffective assistance of trial counsel.

G.  Ineffective Assistance of Appellate Counsel

Petitioner claims that his appellate counsel rendered ineffective assistance by raising claims which had been waived by trial counsel and were therefore "moot under California Law." (Pet. at 48.)  He also argues that his appellate counsel improperly failed to raise on appeal

31

1 the claims contained in the instant petition.  (Id. at 8, 48-51.)  As set forth above, the Solano

2 County Superior Court denied relief as to these ineffective assistance of counsel claims on the

3 basis that petitioner had failed to demonstrate prejudice.

4    The Strickland standards apply to appellate counsel as well as trial counsel.  Smith

5 v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).

6 However, an indigent defendant "does not have a constitutional right to compel appointed

7 counsel to press nonfrivolous points requested by the client, if counsel, as a matter of

8 professional judgment, decides not to present those points."  Jones v. Barnes, 463 U.S. 745, 751

9 (1983).  Counsel "must be allowed to decide what issues are to be pressed."  Id.  Otherwise, the

10 ability of counsel to present the client's case in accord with counsel's professional evaluation

11 would be "seriously undermined."  Id.  See also Smith v. Stewart, 140 F.3d 1263, 1274 n.4 (9th

12 Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is

13 not even particularly good appellate advocacy.")  There is, of course, no obligation to raise

14 meritless arguments on a client's behalf.  See Strickland, 466 U.S. at 687-88 (requiring a

15 showing of deficient performance as well as prejudice).  Thus, counsel is not deficient for failing

16 to raise a weak issue.  See Miller, 882 F.2d at 1434.  In order to demonstrate prejudice in this

17 context, petitioner must show that, but for appellate counsel's errors, he probably would have

18 prevailed on appeal.  Id. at 1434 n.9.

19    The decision of the Solano County Superior Court should not be set aside in this

20 regard.  Appellate counsel's decision to press only issues on appeal that he believed, in his

21 professional judgment, had more merit than the claims suggested by petitioner was "within the

22 range of competence demanded of attorneys in criminal cases."  McMann v. Richardson, 397

23 U.S. 759, 771 (1970).  Further, for the reasons set forth above, this court has not found merit in

24 any of the claims raised in the instant petition.  Of course, petitioner's appellate counsel had no

25 obligation to raise meritless issues on appeal.  Strickland, 466 U.S. at 687-88.

26 /////

1    Petitioner has failed to establish that the state court's rejection of his ineffective

2  assistance claims "resulted in a decision that was contrary to, or involved an unreasonable

3  application of, clearly established Federal law" or "resulted in a decision that was based on an

4  unreasonable determination of the facts in light of the evidence presented in the State court

5  proceeding." 28 U.S.C. § 2254(d). Accordingly, he is not entitled to habeas relief on his claims

6  of ineffective assistance by appellate counsel.

7                                          CONCLUSION

8    Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

9  a writ of habeas corpus be denied.

10    These findings and recommendations are submitted to the United States District

11  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty

12  days after being served with these findings and recommendations, any party may file written

13  objections with the court and serve a copy on all parties. Such a document should be captioned

14  "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections

15  shall be served and filed within ten days after service of the objections. The parties are advised

16  that failure to file objections within the specified time may waive the right to appeal the District

17  Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

18  DATED: July 14, 2009.

19

20    _____

21    DALE A. DROZD
      UNITED STATES MAGISTRATE JUDGE

22  DAD:8:
    sanders2250.hc

23

24

25

26

                                               33